UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

LEIGHANNE N. WELLER,          )
                             )
        Plaintiff,           )
                             )
    vs.                      )          Case No. 1:15-CV-134-CEJ
                             )
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security, )
                             )
        Defendant.           )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.    Procedural History

On October 6, 2011, plaintiff Leighanne N. Weller filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381, *et seq.*,[1] with an alleged onset date of March 1, 2005.  (Tr. 242–47)  After plaintiff's application was denied on initial consideration, (Tr. 102–03, 110–14), she requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 115–17)  Plaintiff and counsel appeared for hearings on May 16, 2013, and January 13, 2014.  (Tr. 31–92)  The ALJ issued a decision denying plaintiff's application on February 6, 2014.  (Tr. 8–24)  Plaintiff

---

[1]The record also contains several applications for disability insurance benefits, Title II, 42 U.S.C. §§ 401, *et seq.*, including one filed on October 6, 2011.  (Tr. 248–58)  In the complaint and in her briefs, plaintiff references those applications and appears to also seek judicial review of the denials of disability insurance benefits.  [Docs. ##1, 13, 19]  The ALJ's decision addressed and denied only plaintiff's October 6, 2011, application for supplemental security income.  (Tr. 8–24)  The Commissioner maintains that plaintiff did not here exhaust her administrative remedies with respect to any other claim.  [Doc. #9 at 1]  Plaintiff does not challenge that assertion.  Consequently, the Court has jurisdiction to review only the decision denying the October 6, 2011, application for supplemental security income.  *See Sipp v. Astrue*, 641 F.3d 975, 979–80 (8th Cir. 2011).  Of course, the Court references evidence antedating and postdating that application in reviewing the record as a whole for substantial evidence, including records submitted here pertaining to other applications.  *See, e.g., Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997).

requested the Appeals Council reverse the ALJ's decision and remand for a new hearing. (Tr. 6–7, 343–44) The Appeals Council denied plaintiff's request for review on June 4, 2015. (Tr. 1–4) Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. <u>Evidence Before the ALJ</u>

Only plaintiff's allegedly disabling mental impairments are at issue in this appeal. Consequently, the discussion below primarily addresses the evidence of plaintiff's psychological conditions and their attendant symptoms.

### A. <u>Disability Application Documents</u>

Plaintiff was born on July 2, 1982. (Tr. 242) She graduated from high school, and she was never placed in special education classes or given an Individualized Education Program (IEP). (Tr. 275) After graduating from high school, plaintiff began taking college courses, but she "had to drop out due to sickness while she was pregnant." (Tr. 702)

Plaintiff was married at the time of her application, (Tr. 250), but divorced by August 2013. (Tr. 338) Plaintiff had two dependent children at the time of her application. (Tr. 251) Following her separation and subsequent divorce, her children no longer live with her. (Tr. 715) Though plaintiff has never asserted trouble managing her own finances, she does not presently have a bank account. (Tr. 251)

On August 5, 2008, plaintiff completed a Function Report. (Tr. 281) She was then living with friends and her children. *Id.* Her daily activities consisted of dressing herself and her children, cooking, doing laundry, cleaning, bathing herself and her children, playing with them, and sleeping. *Id.* Plaintiff reported her

conditions did not affect her sleep or personal care, though she was "clumsy." (Tr. 282) She also did not need reminders to take medications or to care for her personal needs, or to perform her household chores. (Tr. 283)

Plaintiff left her apartment every day without assistance, and was able to drive a car. (Tr. 284) She had no difficulty shopping. *Id.* Her hobbies included watching television, listening to music, and visiting with family and friends. (Tr. 285) Plaintiff induced no problems in her familial relationships or in her relationships with friends, neighbors, and others. (Tr. 285–86) She visited and spoke with her friends or family daily; her ability to socialize had not been affected by the onset of her allegedly disabling conditions. *Id.*

Plaintiff reported that her coordination, concentration, and memory were affected by her mental impairments. (Tr. 286) However, plaintiff also stated that she experienced no challenges completing tasks, understanding, or following instructions. *Id.* She also said that she does not finish what she starts. *Id.* She could follow written instructions well, and had a fair ability to follow spoken instructions. *Id.* Plaintiff reported that she relates well to authority figures. (Tr. 287) Though plaintiff wrote that she experiences unquantified nervousness and anxiety, she also reported a fair ability to handle both stress and changes to her routine. *Id.*

On August 12, 2008, Ginger Hanselman, a medical consultant, completed a Physical Residual Functional Capacity Assessment of plaintiff. (Tr. 95–99) Plaintiff's primary diagnosis was "[h]eadaches," with other alleged impairments of a neurological disorder and fatigue. (Tr. 95) Plaintiff specifically alleged a "neurological disorder, headaches, anxiety attacks, and fatigue." (Tr. 97) At that

time, plaintiff had been treated by an unidentified neurologist, who diagnosed plaintiff with "tension headaches" and had prescribed her Elavil (Amitriptyline), an antidepressant.  *Id.*

According to Henselman's report, plaintiff claimed that the "headaches occur four times a week and can last all day."  *Id.*  Her MRI was "abnormal," but examination revealed "no deficits."  *Id.*  Plaintiff's "partially credible" symptoms included the headaches and feeling tired and nervous.  (Tr. 99)  She provided all of the care for her children, cooked, cleaned, shopped, socialized, and managed her own finances.  *Id.*  Though plaintiff's coordination was not "very good," she alleged "no memory problems."  *Id.*  The Social Security Administration listed plaintiff's diagnosis as, "Other Disorders of the Nervous System."  (Tr. 100)

Plaintiff completed another Disability Report sometime in early October 2011, following the instant application for supplemental security income.  (Tr. 292)  She was experiencing a neurological disorder, headaches, anxiety attacks, fatigue, a back condition, and depression, the conditions for which she is presently requesting benefits.  (Tr. 103, 110, 296)  Plaintiff was interviewed by an employee of the Social Security Administration, who remarked that plaintiff appeared to have difficulty answering questions.  (Tr. 293)  For example, plaintiff "guessed at a lot of dates."  (Tr. 294)  At the same time, however, she did not appear to have difficulty understanding, concentrating, or talking.  (Tr. 293)

At that time, plaintiff had prescriptions for Ambien (Zolpidem), an anti-insomnia medication; Hydrocodone, an analgesic; Trazadone, a sleep aid; Xanax (Alprazolam), an anti-anxiety and anti-depressant medication; and vitamin B-12 injections.  (Tr. 299)  She was being treated by Jim Pang Jr., M.D.  (Tr. 300–01)

She occasionally also sought treatment from Dennis Reed, M.D., for "bad migraines or whenever" she could not "get in to see" other physicians. (Tr. 301) Plaintiff additionally recalled having been treated by licensed clinical social worker John Hunter, M.A., L.P.C., from 2008 until 2011 for "mental problems" and "threatening suicide." (Tr. 304) Following a suicide attempt in 2008, plaintiff indicated she had begun receiving her present medications, with additional counseling. (Tr. 304–05)

Plaintiff remained able to drive. (Tr. 309) She completed a Function Report in which she wrote that she lived with friends. (Tr. 311) She would awake at 8:00 a.m., eat breakfast, shower, watch television, and then go to bed at 9:00 p.m. *Id.* Yet, she claimed to suffer from insomnia. (Tr. 312) When asked to describe how her conditions affect her ability to function. plaintiff wrote: "Not sure [be]cause I've had problems since I was 8 [years old]." *Id.*

In the October 2011 Function Report plaintiff reported that she had no difficulty with personal care and grooming. (Tr. 312–13) She also did not need reminders to groom herself or take her medications. *Id.* Plaintiff also prepared her own meals, cleaned, and did her own laundry. (Tr. 313) However, she sometimes required a "push to do" those activities, because she does not "always feel good." *Id.* She also described herself as "clumsy." (Tr. 314)

Plaintiff had no problems managing her own finances. *Id.* Her daily routine included socializing with friends, which she retained the capacity to do without difficulty. (Tr. 315) Plaintiff also reported that she found it difficult to get along with family, friends, neighbors, and others whenever "people have a problem getting along with" her. (Tr. 316) She attributed this to being "too nice and believe[ing] people too eas[ily]." *Id.*

In that same report, plaintiff was asked whether she had any memory deficits or challenges completing tasks. *Id.* She identified none. *Id.* Nor did she mention any difficulty understanding or following instructions. *Id.* She related well to authority figures. *Id.* She also attested to having some unspecified difficulty maintain concentration, though she had a good ability to follow written instructions and a fair ability to follow spoken instructions. (Tr. 316–17) Plaintiff wrote that she does not handle stress or changes in her routine very well. (Tr. 317) In contrast to the 2008 Function Report, in which plaintiff reported experiencing nervousness and anxiety, she did not mention these conditions when asked in the 2011 Function Report. *Id.*

According to plaintiff, on December 1, 2011, her conditions became worse because she could not "go to the doctors," as she lacked funds or insurance, and she therefore could not obtain her prescription medications. (Tr. 321) On December 13, 2011, the Social Security Administration determined plaintiff had a primary diagnosis of discogenic and degenerative disorder of the back, with a secondary diagnosis of migraines. (Tr. 102) In her February 16, 2012, request for a hearing, plaintiff wrote that her "back hurts all the time" and she gets very "nervous around people and situations." (Tr. 115) Plaintiff subsequently completed an undated Disability Report. (Tr. 321–26) Though she had worked for three days, (Tr. 254–55), she had been fired for unspecified reasons on January 31, 2012. (Tr. 325)

On July 1, 2013, plaintiff's father, James C. Ramsey, filed an affidavit in support of her claim. (Tr. 328–32) According to Ramsey, plaintiff's "emotions fluctuate almost daily from being happy or even elated to being depressed[,] to

having feelings of low self esteem." (Tr. 330) He also remarked that plaintiff is "clumsy," sometimes dropping objects, and she has trouble concentrating, with additional unspecified "personality abnormalities." (Tr. 330–31) Ramsey attests plaintiff is very childlike and can easily be persuaded. (Tr. 331)

## B. May 16, 2013 Hearing

On May 16, 2013, an ALJ held a hearing, which plaintiff and her counsel attended. (Tr. 31–43) At the hearing, plaintiff's counsel characterized the medical condition she had suffered at age 8 as a "traumatic brain injury." (Tr. 34) As a result of that injury, she received Social Security benefits from age 8 until approximately age 23. *Id.* That injury stemmed from a routine appendectomy, during which an anesthetic error caused her to suffer "brain damage," resulting in eight months of hospitalization to treat her physical and mental symptoms. (Tr. 34–35) According to plaintiff's counsel, her brain injury is a "permanent condition." (Tr. 36) Counsel also noted that plaintiff "does not explain" her condition well. *Id.*

Plaintiff's counsel also maintained that none "of the treating sources that the Social Security Administration" had examine plaintiff "even kn[e]w that she . . . has [a] traumatic brain injury." (Tr. 38) The attorney stated that plaintiff's treating physicians were "not treating her for" a traumatic brain injury, but whether "they know she has it or not is a different question." *Id.* The ALJ responded that at least some of plaintiff's treating physicians must have been aware of plaintiff's condition, because it is documented in her medical records. *Id.* Counsel requested an evaluation of the condition, and the ALJ ordered a psychological consultative examination, with cognitive testing. (Tr. 37, 39) The ALJ recessed the hearing to

accommodate that testing and to allow further development of the evidentiary record.  (Tr. 36–41)

## C.  January 13, 2014 Hearing

On January 13, 2014, a different ALJ held a second hearing, which plaintiff and her counsel also attended.  (Tr. 44–92)  Plaintiff had been under the care of Pavin Palepu, M.D., a psychiatrist, since May 2013.  (Tr. 47)  Because Dr. Palepu had not yet responded to counsel's request for an assessment of plaintiff's psychiatric functioning, counsel asked that the record be kept open "for approximately ten days to see if" counsel could obtain that report.  *Id.*  The ALJ agreed.  *Id.*  But Dr. Palepu did not submit his report, a Mental Impairment Questionnaire, until February 21, after the ALJ's decision was issued.  (Tr. 783–88)

Dr. Karl Manders, a medical expert, testified at the hearing based on his review of plaintiff's medical records; he had not treated or examined plaintiff.  (Tr. 49–50)  Dr. Manders opined that plaintiff has "significant problems from a psychological area and possibly for a cognitive area."  (Tr. 51)  According to Dr. Manders, plaintiff's brain injury could be categorized as a "stroke."  *Id.*  It was "unbelievable that she recovered as well as she did, but it appear[ed] that[,] from a contemporary standpoint[,] her primary problem is psychiatric, and is not on a neurological basis."  (Tr. 51, 54)  Dr. Manders also remarked that plaintiff "does have apparently, or did have[,] some residual of her neurological deficit" from the stroke.  (Tr. 52)

From "a functional standpoint," however, plaintiff has "pretty well recovered from" that neurological deficit.  *Id.*  Plaintiff's medical records, Dr. Manders explained, showed "at times that she had some neurological abnormalities, but they

did not translate into an impairment or a listing." *Id.* Dr. Manders opined as to plaintiff's physical condition, but remarked that her "primary problem" is "psychological." (Tr. 53)

Plaintiff's headaches, according to Dr. Manders, would be expected to be, "many times[,] in a situation like this," based on "psychological problems." (Tr. 53–54) Dr. Manders also noted that a November 28, 2011, CT scan of plaintiff's brain showed "prominent bilateral basal ganglia paravascular spaces versus encephalomalacia," which is the "shrinkage of the brain" that is "secondary to the stroke." (Tr. 56) Dr. Manders remarked that plaintiff's brain shrinkage is "not in itself a cause of" her headaches, but is a "significant neurological finding[,] obviously." *Id.* However, plaintiff had "really remarkable recovery" from the stroke, considering that, shortly after the stroke "she occasionally would fall down going down steps, and occasionally" would "lose her train of thought." *Id.* As Dr. Manders explained, "because of the stroke," plaintiff's "brain shr[ank] a little bit" due to "some damage to the tissue," and "the shrinkage of the brain is a normal finding after the brain has been injured." *Id.*

Based on those findings, Dr. Manders was asked to explain the long-term symptoms of plaintiff's brain injury. (Tr. 57) He opined that plaintiff's symptoms included "occasionally" falling, tripping, or losing "her train of thought." *Id.* However, the records showed "she was a C plus average student or a B [student], so intellectually she did pretty darn well." *Id.* According to the records, plaintiff also "complained of dizzy spells" and "had a little trouble with speech," specifically "dysarthria," which is a "little slowness" in her speech pattern. *Id.*

Further, plaintiff suffered from a "slight weakness on the right side" of her body, with "dystonia," an "abnormal movement in the right foot and ankle." *Id.* Dr. Manders inquired of the ALJ whether plaintiff had a neuropsychological evaluation, because, he testified, an MRI or a CAT scan would not necessarily show the damage to plaintiff's brain. (Tr. 57–58) Specifically, such testing might show "evidence of some difficulty secondary to the stroke," but it would not "describe how the brain is working." *Id.* Consequently, whether plaintiff's "present difficulty" was "related to that" brain injury "would have to be determined by a neuro psychologist doing extensive neuro consultative work-ups," from which it could be "discover[ed] whether the problem is" on a "organic or structural basis[,] versus more of a psychological one." (Tr. 58)

Dr. Charles D. Auvenshine, a medical expert, also testified at the hearing. *Id.* As with Dr. Manders, Dr. Auvenshine had never examined or treated plaintiff. (Tr. 59) According to Dr. Auvenshine, plaintiff suffers from five categories of "mental impairments" recognized by the Social Security Administration: 12.02 organic; 12.04, affective disorder; an anxiety-related disorder; 12.08, personality disorder; and 12.09, substance addiction disorder. (Tr. 60) Dr. Auvenshine opined that plaintiff's mental impairments taken "individually" do not meet a listing. *Id.* He did not opine as to the cumulative effects of those five conditions.

As to the symptoms of those conditions, Dr. Auvenshine highlighted that plaintiff had on one occasion denied "agitation anxiety and depression," suicidal ideation, and judgment abnormality, and that in that instance memory impairments were "not detected." (Tr. 60–61) However, the report Dr. Auvenshine referenced is from October 21, 2002, before plaintiff's alleged onset date. (Tr. 404) In

addition, that report details plaintiff's treatment at a clinic for a urinary tract infection, not treatment by a psychiatrist. *Id.*

Further, in that same report, the treating physician, William Bryant, M.D., indicated that plaintiff denied having symptoms of any kind. *Id.* In the same report in which Dr. Bryant wrote that plaintiff suffered from a urinary tract infection, he also wrote that plaintiff did not have a recent infection. *Id.* Dr. Bryant also noted that plaintiff denied nocturia (waking at night to urinate), noting at the same time that plaintiff's "chief complaint" included "nocturia." *Id.* Additionally, Dr. Bryant wrote that plaintiff complained of "some nausea," but he noted, "[n]ausea denied." *Id.* Even though Dr. Bryant had remarked just one month earlier that plaintiff's right leg is longer than her left leg, (Tr. 405), he wrote on October 21 that he detected no such physical abnormality. (Tr. 404) Dr. Auvenshine offered no testimony to explain his reliance on the report from 2002 as proof that, beginning three years later in 2005, plaintiff suffered no serious mental health symptoms.

According to Dr. Auvenshine, plaintiff had remarked that her physical impairments kept her from working because of her depression, but she also denied any limitation "secondary to the depression." (Tr. 61) To the contrary, however, the exhibit Dr. Auvenshine referenced, which is a pre-hearing memorandum written by plaintiff's counsel, specifically notes plaintiff's "long history of depression with suicidal thoughts," two in-patient psychiatric hospitalizations following suicidal ideation, bipolar disorder, major depressive disorder, which plaintiff described as "severe," borderline personality disorder, and concentration difficulties. (Tr. 336–

42) Dr. Auvenshine did not clarify his testimony regarding the pre-hearing memorandum.

Referring to medical records from January 1, 2005, onward, Dr. Auvenshine noted that plaintiff had been "diagnosed with depression," which her physicians described as "severe" and "recurrent." (Tr. 61, 528–55) As Dr. Auvenshine admitted, (Tr. 61), those records show plaintiff also was diagnosed with "generalized anxiety disorder," "substance abuse," and a "personality disorder," with "narcissistic histrionic traits." (Tr. 528–55) However, Dr. Auvenshine said, during that same period plaintiff's mental status was remarked to have been normal on several occasions, with normal mental status examinations. (Tr. 61)

Dr. Auvenshine additionally examined the records of the neuropsychological examination Stephen Jordan, Ph.D., performed on plaintiff on July 30, 2013. (Tr. 61, 742–50) As Dr. Auvenshine noted, plaintiff was diagnosed with depression, bipolar disorder, and substance abuse, which was in remission. (Tr. 61–62) Though plaintiff had no Axis II or Axis III diagnoses, a "history of abusive relationships" qualified as an Axis IV environmental factor affecting her conditions. (Tr. 62) On Axis V, plaintiff's Global Assessment of Functioning (GAF) was 65, and a previous GAF was 76. *Id.*

Dr. Auvenshine testified that plaintiff's medical records show she had "overdosed" on medications on April 27, 2012, for which she had been admitted to the hospital for psychiatric care until May 4, 2012. *Id.* Based on Dr. Auvenshine's "summary of" the "findings in the record," plaintiff had not experienced hallucinations, was "not psychotic," and was "thought to be of average intelligence" at the time of her hospitalization. *Id.*

Dr. Auvenshine opined that plaintiff's "substance problem" with drugs and alcohol was not material. *Id.* Additionally, Dr. Auvenshine opined that plaintiff's activities of daily living were mildly limited, her social limitations were mild, and her concentration, persistence, and pace were mildly limited. *Id.* The doctor also determined that the records showed plaintiff had experienced "no actual outright episodes of decompensation." *Id.* As just mentioned, however, Dr. Auvenshine recognized that plaintiff had been placed in emergency, in-patient psychiatric care for suicidal ideation. To use his parlance, that hospitalization is an "outright episode of decompensation." *Id.* Dr. Auvenshine did not clarify that discrepancy in his testimony.

Further, of course, Dr. Auvenshine had not reviewed Dr. Palepu's assessment of plaintiff's mental conditions and symptoms, because that report had not yet been submitted. (Tr. 63) In addition, Dr. Auvenshine admitted that he could not read "some" unspecified records from plaintiff's counseling sessions from April 27, 2012, until the date of the hearing. *Id.* The ALJ did not inquire about Dr. Auvenshine's admission that certain unidentified records were not considered when he formed his opinions.

As plaintiff's counsel then noted, her treatment records from December 28, 2013, show she was experiencing a "delusional thought process." *Id.* In response, Dr. Auvenshine testified that particular record was "marginal in terms of not being able to read it." (Tr. 63–64) He then went on to explain that he could see what the attorney was asking about, because checkboxes on that form were marked for both delusions and paranoia. *Id.* Dr. Auvenshine again did not explain the

discrepancy between his opinion testimony and the records he purportedly relied on to form that opinion.

Plaintiff's counsel additionally highlighted that records showing "some delusional thought process" were "counter-indicative of what" Dr. Auvenshine had "testified to." (Tr. 64) Specifically, counsel inquired about the discrepancy between Dr. Auvenshine's testimony that there was no evidence plaintiff experienced "any psychotic episodes" and the noted delusional thought processes, which "would show at least one instance" of such an episode. *Id.* Dr. Auvenshine responded, "yes, and what I cited came from the record." *Id.* But Dr. Auvenshine then did not explain the inconsistency, and the ALJ did not inquire about it.

As Dr. Auvenshine admitted, the notation that plaintiff was delusional and experiencing paranoia "was recorded by the examining specialist" who treated plaintiff. *Id.* But, according to Dr. Auvenshine, there were "areas of suspiciousness that would fall within the normal range," which are "sometimes quoted as paranoia." *Id.* Yet, Dr. Auvenshine did not explain whether he believed, or had evidence to support the assertion, that was so in this instance. Further, Dr. Auvenshine admitted that he did not "know how severe this paranoia is or whether" plaintiff was "marginally psychotic or maybe totally documented" as psychotic. *Id.* Following Dr. Auvenshine's concession that his opinion did not incorporate an understanding of the severity of plaintiff's paranoia, or whether she was marginally or totally psychotic, the ALJ did not inquire further.

Plaintiff testified at the second hearing. (Tr. 65) She was at that time 31 years old, and divorced. (Tr. 66) She was living with her boyfriend, while her children lived with their father. (Tr. 67) She had no income. (Tr. 68)

Plaintiff last worked in 2008, at a fast food restaurant.  (Tr. 70)  She "quit" that job after two days because it "was too hard taking those orders."  *Id.*  She testified that the job required her "to push buttons and stuff, and [she] got confused real easy."  *Id.*  At some point years ago, plaintiff testified, she had also worked for a week and a half cleaning an elderly person's home.  *Id*.  She had no other work experience.  *Id.*  Her alleged onset date, March 1, 2005, is the same day she last received childhood Social Security benefits.  (Tr. 70–71)

Plaintiff had no difficulty reading or writing.  (Tr. 69)  However, she testified that she is not a frequent reader and that she spends most of her leisure time watching television and movies.  (Tr. 73)  As to her activities of daily living, plaintiff stated that she wakes inconsistently between 6:00 a.m. and noon, and then typically makes coffee and cereal or oatmeal.  (Tr. 71)  "On a good day," she will "do some light housework," including placing dishes in the dishwasher or sweeping. *Id.*  But because she gets tired very easily, she has to "keep it pretty mild" and also take naps during the day.  *Id.*  She also cooks, but not very often.  *Id.*  Plaintiff no longer does her own laundry.  (Tr. 72)  She avoids vacuuming and mopping because it hurts her back.  *Id.*  She does her own grocery shopping and is able to carry her bags.  *Id.*  The ALJ noted that in her application she had also reported that she drove, prepared her own meals, did her own laundry, and managed her own finances.  (Tr. 73)  Plaintiff testified that by the time of the second hearing she no longer engaged in those activities.  *Id.*  However, she retains the ability to drive. *Id.*

Plaintiff does "[n]ot really" have friends; she does not "mess with a lot of people," to avoid "trouble."  *Id.*  She has discontinued contact with her former

friends, because she considers them a bad influence. (Tr. 74) Plaintiff described her relationship with her boyfriend as, "pretty good." (Tr. 72–73) She also relates well to her children and her father, but not her mother. (Tr. 73) She is not active in any civic organizations, but attends religious services occasionally. *Id.*

Plaintiff also admitted to using methamphetamine, crack cocaine, and marijuana. (Tr. 74–75) By the hearing date, she testified, she had abstained from all drugs for at least six months. (Tr. 75) She occasionally smokes cigarettes when she is nervous, though she is attempting to quit. (Tr. 75–76) She testified that she has never had a drinking problem, and no longer drinks alcohol. (Tr. 76)

Plaintiff had discontinued taking Ambien, Hydrocodone, Xanax, and vitamin B-12 injections. *Id.* She was still using Trazodone to treat her sleep disorder. *Id.* Plaintiff was also taking prescription Abilify (aripiprazole), an antipsychotic medication used to treat her bipolar disorder and depression; Trileptal (oxcarbazepine), a medication for bipolar disorder; and Vistaril (hydroxyzine), to treat her anxiety. (Tr. 76–77) Weight gain is a side effect of the medications, according to plaintiff. (Tr. 78) Because of the weight gain, plaintiff ceases taking her prescribed medications "about once a month." *Id.* However, she consistently resumes the medications because, after "a week or so," she will not "feel like" herself without them. *Id.*

As to her symptoms both on and off of those medications, plaintiff testified to feeling depressed, which includes being "really sensitive" and experiencing frequent crying spells. (Tr. 78) She also testified to suffering from anxiety, including experiencing anxiety or panic attacks. (Tr. 78–79) However, because she is taking medication for those conditions, it had been "a while" since she had an attack. *Id.*

When an anxiety attack occurs, she seeks relief by breathing deeply and trying "to get somewhere where [she] can be calm." *Id.*

Plaintiff also described suffering from what she believes is bipolar disorder, manifesting mood swings that "normally run[] from being really happy to being really sad," depending on the day. (Tr. 79) She admitted to not experiencing auditory or visual hallucinations. *Id.* Plaintiff testified to having difficulty concentrating, and "maybe" having trouble getting her "thoughts together." *Id.* Among other physical symptoms, plaintiff testified that she is "real clumsy" and will "drop stuff a lot." (Tr. 77)

Plaintiff also testified that she has "always" experienced headaches approximately once every week or two weeks. (Tr. 84–85) The headaches manifest in her temples and sometimes develop into migraines. For relief, plaintiff will "lay down and get in a dark room or in the bathtub." (Tr. 85) The headaches last from a "couple hours" to a "couple days." *Id.* Plaintiff had sought treatment for the headaches, which, she testified, would not subside absent medical intervention. But by the time of the hearing she was no longer receiving the treatment. *Id.* Plaintiff was unsure about the medications she had acquired or been prescribed for headaches, though she recalled at some point having taken Phenergan (promethazine), an anti-nausea medication for migraines, and receiving injections. (Tr. 85–86)

Plaintiff admitted she had used drugs as a teenager and then stopped for about ten years, until 2011, when she was "mixed up with the wrong people," her former friends. (Tr. 81) She initially used methamphetamine and crack cocaine "every day" after separating from her husband. (Tr. 81–83) But, she clarified, she

ceased daily use approximately five months later when she moved in with her mother, at which point she "might go weeks without it," but then would use again. (Tr. 82)  Plaintiff reiterated that she discontinued using all illegal drugs between six and seven months before the second hearing.  (Tr. 83)  She admitted that she had told Dr. Jordan she had "very limited periods of sobriety."  *Id.*  However, plaintiff testified that she did not know what that meant when she said it.  *Id.*

Plaintiff also testified that she could not "make any sense of" her three previous separations from her ex-husband, or her behaviors that preceded them, because it "was like there was someone else in [her] body doing" it; she "had no control over it."  *Id.*  Describing what precipitated her two prior in-patient hospitalizations for suicidal ideation, plaintiff averred that after she left her husband, she "felt like" she "didn't see" or "have a point" in "living."  (Tr. 86)  She "felt like [she] was worthless and nothing," which made her "really depressed," emotions she "still struggle[s] with."  *Id.*  "[A]t times," plaintiff "feel[s] like maybe" she "need[s] to go back to the hospital," but she will instead speak to her father for "positive reinforcement."  *Id.*

The first time plaintiff had been hospitalized, she had used methamphetamine or crack cocaine "a week prior."  *Id.*  But, according to plaintiff, she had not recently used any illegal drugs preceding her second hospitalization.  *Id.*  Additionally, as plaintiff explained—and as the medical records show, contrary to Dr. Auvenshine's description of those records—she had not overdosed on drugs in either instance.  (Tr. 86–87)  Rather, plaintiff had been experiencing thoughts that she could not control, after which she threatened to, but did not, overdose on

her medications.  *Id.*  Her mention of suicide and a specific plan prompted Dr. Palepu to suggest plaintiff seek in-patient treatment, which she did.  (Tr. 87)

As noted, Dr. Palepu was plaintiff's treating psychiatrist.  (Tr. 84)  According to plaintiff, however, Dr. Palepu did not "really give [her] any advice."  *Id.*  He would "just ask[]" plaintiff "questions and see[] how" she was "doing," and he would then provide her renewed prescriptions for her medications.  *Id.*  Plaintiff was also "supposed to" see a counselor during her visits to Dr. Palepu's office, but doing so costs $15.00 per visit, which she could not afford.  *Id.*

Dr. Carla F. Watts, a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education, and with no past relevant work, who retains the capacity to perform the exertional demands of light work, with some physical restrictions.  (Tr. 87–89)  Specifically, according to the ALJ's hypothetical, such an individual could lift twenty pounds occasionally, ten pounds frequently, and could sit, stand, or walk for six hours out of an eight hour workday, for a total of eight hours in an eight hour workday.  *Id.*  That hypothetical individual, who has no transferable work skills, also would be limited to occasionally climbing, balancing, stooping, crouching, kneeling, or crawling, and to only occasionally being exposed to ladders, ropes, or scaffolds, without any concentrated exposure to moving machinery or unprotected heights.  (Tr. 89)  The ALJ's hypothetical to the vocational expert included no provision for any mental limitations.  (Tr. 88–89)

The vocational expert opined that such a hypothetical individual could perform the representative light, unskilled jobs of fast food worker (DOT #311.472-010); hand packager (DOT #753.687-038); or picking table worker (DOT

#521.687-102).  (Tr. 89–90)  The positions of picking table worker and hand packager may involve working with moving conveyor belts, and a fast food worker may be required to interact with customers and other employees.[2]  After the vocational expert offered those exemplars, the ALJ did not adjust his hypothetical to account for any symptoms of mental impairments.  (Tr. 90)  Thus, the vocational expert's testimony did not address whether a person could perform any of those jobs, or other jobs that exist in substantial numbers in the national economy, with any singular or combined symptoms of any mental impairment.

Plaintiff's counsel inquired whether such a hypothetical individual could still perform those representative jobs if she were, "required to miss at least one day of work a month, say, for example, for her headaches."  (Tr. 91)  The vocational expert testified that such a person could perform any of those jobs if she were to miss only one day of work per month, but not if her conditions caused her to miss

[2]A "fast-foods worker," or cashier:

> Serves customer of fast food restaurant: Requests customer order and depresses keys of multicounting machine to simultaneously record order and compute bill.  Selects requested food items from serving or storage areas and assembles items on serving tray or in takeout bag. Notifies kitchen personnel of shortages or special orders.  Serves cold drinks, using drink-dispensing machine, or frozen milk drinks or desserts, using milkshake or frozen custard machine.  Makes and serves hot beverages, using automatic water heater or coffeemaker.  Presses lids onto beverages and places beverages on serving tray or in takeout container.  Receives payment.  May cook or apportion [F]rench fries or perform other minor duties to prepare food, serve customers, or maintain orderly eating or serving areas.

http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT03A.HTM (last visited July 11, 2016).  A picking-table worker: "Picks stems, stones, metal, or wood not eliminated by trash-picking machine from conveyor to prevent damage to beet knives" and, "[m]ay trim tops from beets to prevent clogging of knives in slicers."  http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT05B.HTM (last visited July 11, 2016).  A packing-line worker:

> Performs any combination of following tasks as member of conveyor line crew to finish and pack plastic or rubber footwear: Sorts and mates pairs and places them on conveyor.  Opens or closes buckles, snaps fasteners together, inserts laces in eyelets, and ties loops (frogs) around buttons.  Counts and tallies production or records on counter.  Wraps pair in tissue, places them in shoe box, and packs boxes in cartons.  Places rejects in boxes or racks for repair or mating.

http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT07D.HTM (last visited July 11, 2016).

two or more days per month.  *Id.*  Further, according to the vocational expert, an individual as described in the ALJ's hypothetical—*i.e.*, a person without any symptoms of mental impairments—who would be required to miss two days or more per month of work is precluded from "any work."  *Id.*

### D.  Medical Records

### 1.  Pre-Application Records

On June 21, 1991, four months after plaintiff's stroke, speech and language pathologist Sandra Matthews remarked that plaintiff continued to struggle with "comprehension of multiple step commands."  (Tr. 352)  She also "exhibit[ed] impulsive behaviors," which Matthews "suspected [were] secondary to her neuropathy."  (Tr. 353)  Plaintiff "require[d] numerous cues to remain on task."  *Id.*  She had "impaired performance on oral directions both in formal testing and during functional tasks."  (Tr. 354)  She "required numerous repetitions of complex commands consisting of multiple semantic relations (*i.e.*, 'place the small red circle to the left of the large green triangle.')."  *Id.*  However, her comprehension was "intact[,] with the exception of multiple complex commands," which, Matthews suggested, "may be secondary to attention difficulties."  *Id.*

Further, plaintiff exhibited "enthusiasm at the outset of reading activities," but she "fatigue[d] quickly and exhibit[ed] frustration."  *Id.*  She also required "numerous cues to complete" writing tasks.  (Tr. 355)  Plaintiff was diagnosed with "moderate attention difficulties."  *Id.*

Andrew Painter, M.D., treated plaintiff on February 19, 1992.  (Tr. 362)  Dr. Painter noted that plaintiff complained of "occasional headaches," which were "relieved by Tylenol."  *Id.*  According to Dr. Painter, plaintiff's handwriting and

speech had improved since her stroke. Ramsey "complain[ed] that she will occasionally still lose her train of thought and has a somewhat delayed response to questions." *Id.* Dr. Painter determined that, despite improvements in several neurological conditions, plaintiff continued to exhibit "mild" speech issues, "markedly unsteady" gait, and "clumsy" finger movements. *Id.*

No evidence of record details plaintiff's condition from February 1992 until mid-2000. On June 12, 2000, Michael Noetzel, M.D., assessed plaintiff's neurological condition. (Tr. 367) She continued to experience a "minimal" speech impediment, with "fairly good language and communication skills." (Tr. 368)

Michael Murphy was plaintiff's twelfth-grade teacher, and had known her for seven years. (Tr. 384) On November 2, 2000, Murphy reported that plaintiff, "tends to drift off during class" and has "difficulty in focusing on tasks at hand." *Id.* He remarked that she "often requires repeated instructions," and that was "true even if instructions are also given in a written form as well as orally." *Id.*

Plaintiff was "a very slow worker in class." *Id.* "She often [fell] behind in taking notes and" required "information repeated" to her "several times." *Id.* She was "easily distracted." *Id.* Though plaintiff had a "good relationship with her teachers," Murphy noted that she would "on occasion have trouble with" some of "her peers," so much so that she had "contemplated transferring to another school" because of it. *Id.* According to Murphy, plaintiff "seem[ed] to lack energy," and the "periods of time when she is less willing to tackle difficult tasks correspond[ed] with" those "energy lapses." (Tr. 385)

A few weeks later, in an interview with the Social Security Administration, Murphy reiterated that plaintiff's "energy level seems to drop" as class continues.

(Tr. 390)  She also had "many absences" from school, which, she told Murphy, were due to "being tired, sick, [or] having a headache." *Id.*  Plaintiff was "easily frustrated and want[ed] to give up." *Id.*  Though plaintiff was not afforded an IEP, because she worked at a "slower" pace than most of her peers, Murphy had given her extra time to complete assignments, which she completed inconsistently. *Id.*  Additionally, Murphy remarked that even as plaintiff remained on track to graduate, her "grades tend[ed] to bounce from a C+ to a low of D-." *Id.*

On December 15, 2000, Riyadh Tellow, M.D., assessed plaintiff's neurological functioning.  (Tr. 397–98)  According to Dr. Tellow, plaintiff "appeared simple minded."  (Tr. 397)  "Her speech [was] somewhat slow." *Id.*  She also suffered from diminished coordination. *Id.*

Plaintiff made an unscheduled visit to a primary care center on August 28, 2002, complaining of, *inter alia*, symptoms of "malaise."  (Tr. 408)  Dennis Reed, P.A., examined plaintiff. *Id.*  According to Reed, plaintiff "seem[ed] significantly slow," though Reed suggested that, "may be only representative of her maturity." *Id.*  Plaintiff remarked to Reed that she had, "[s]ome problems with memory." *Id.*

On August 16, 2004, Jyoti Kulkarni, M.D., examined plaintiff.  (Tr. 432)  Plaintiff described "lacking energy to take care of" her newborn baby. *Id.*  She also complained of insomnia and of a "lack of concentration," with "no energy to carry out her daily activities." *Id.*  Dr. Kulkarni diagnosed plaintiff with depression, with somatic symptoms, and sought to rule out post-partum depression. *Id.*  She prescribed a short-term dose of Zoloft (Sertraline), an antidepressant, and recommended plaintiff follow-up after her laboratory test results were available. *Id.*  At that follow-up appointment on August 30, Dr. Kulkarni described plaintiff as

having a "history of depression." (Tr. 433) The Zoloft was "helping her to calm down." *Id.* Dr. Kulkarni diagnosed plaintiff with non-post-partum depression and prescribed Zoloft to treat the condition long-term. *Id.*

Shahid Choudhary, M.D., examined plaintiff on April 24, 2008. (Tr. 505) Plaintiff was prescribed Tramadol, a narcotic pain reliever, to treat her recurrent headaches, which, plaintiff said, occurred approximately four times per week and lasted the entire day. (Tr. 502–03) Plaintiff was also taking prescription Celexa (Citalopram), an antidepressant. (Tr. 505) She complained to Dr. Choudhary of experiencing fatigue and nervousness. (Tr. 505–06) However, plaintiff denied depression. (Tr. 506) Dr. Choudhary determined plaintiff might be experiencing migraine headaches, with "some component" possibly due to tension. *Id.* Dr. Choudhary next examined plaintiff on May 8, 2008, following continued complaints of headaches. (Tr. 504) Believing it was possible the headaches were tension related, Dr. Choudhary prescribed Elavil. *Id.*

On August 18, 2008, Marsha Toll, Psy.D., completed a Psychiatric Review Technique of plaintiff's conditions. (Tr. 517–27) Dr. Toll determined plaintiff had no medically determinable impairment at that time. (Tr. 517) According to Dr. Toll, plaintiff alleged a neurological disorder, headaches, anxiety attacks, and fatigue. (Tr. 527) Dr. Toll did not remark whether plaintiff alleged depression. *Id.*

Reviewing the medical evidence, Dr. Toll concluded plaintiff had diagnosed tension headaches but no diagnosed anxiety. *Id.* According to Dr. Toll, plaintiff's "statements do not indicate that she has any significant problems," given that she "lives with friends and her two children," that she "can care for the children, cook, shop, drive, [and] clean," and that she "leaves her house daily and can do so

alone." *Id.* Dr. Toll determined plaintiff had no medically determinable impairment "for a mental health condition," and "no further investigation [was] warranted." *Id.*

However, by November 21, 2008, plaintiff's mental health condition had deteriorated to the extent she was admitted to the hospital for in-patient psychiatric treatment. (Tr. 528, 536) According to those hospital records, plaintiff had been suffering from depression for at least the past year. (Tr. 539) She was treated for diagnosed "acute" depression and "suicidal ideation." (Tr. 528) From November 21 through November 25, plaintiff was treated for those conditions under the supervision of John Lake, M.D. (Tr. 531–32) She reported poor short-term memory and concentration, with a lack of focus. (Tr. 545) Plaintiff also indicated a strong desire to isolate herself from others and low interest in activities. *Id.* Asked to describe her positive traits, plaintiff said she is intelligent and a good cook. *Id.*

According to Dr. Lake, plaintiff's arrival at the emergency room was precipitated by an "increase in depression and suicidal thoughts in response to recent relationship stressors." (Tr. 531) Hunter was "concerned about her safety" and had recommended she seek emergency treatment, prompting the hospitalization. *Id.* Though plaintiff was not experiencing delusions or hallucinations, Dr. Lake determined her condition warranted a diagnosis of "major depression" and "Generalized Anxiety Disorder." (Tr. 531, 537) Dr. Lake also remarked that plaintiff "exhibited some signs of underlying Personality Disorder," with "dramatic attention seeking" and "narcissistic and histrionic traits," though she "did seem to respond to medications." (Tr. 531, 533)

Plaintiff was prescribed Celexa, for depression; Xanax, for anxiety; and Ambien, for insomnia. (Tr. 531) On November 25, plaintiff was discharged in

"stable condition with no suicidal risk factors." *Id.* Dr. Lake diagnosed several mental health diagnoses at the time of discharge: "Axis I: Depressive Disorder, not otherwise specified. Substance abuse. Axis II: Personality Disorder, not otherwise specified. Axis III: none. Axis IV: Moderate family stressor. Axis V: Current [GAF] was 40 on admission, and on discharge was 60." (Tr. 531–32) Plaintiff's instructions on discharged were to take her medications and to follow up with Hunter for out-patient psychiatric care. (Tr. 534)

A week later, on December 3, Tammy Phillips, F.N.P., examined plaintiff and remarked that she was experiencing seasonal pattern depression and generalized anxiety disorder. (Tr. 577–78) On March 9, 2009, Phillips again remarked that plaintiff was suffering from depression. (Tr. 576)

On October 29, 2009, Charlene Furr, F.N.P., examined plaintiff in response to her complaints of recurrent headaches. (Tr. 573) Plaintiff told Furr that she was not feeling tired, and averred that she had no anxiety, depression, or sleep disturbances. *Id.* Her mood was normal. (Tr. 574)

On November 3, 2009, plaintiff sought treatment for her concern that unspecified medications might lower her blood pressure. (Tr. 570) She was informed that side effect was unlikely. *Id.* During that examination, plaintiff indicated her symptoms were fatigue, weakness, and joint pain. (Tr. 570, 572) She did not report experiencing anxiety, depression, or sleep disturbances. (Tr. 571) However, a few weeks later, on November 24, plaintiff was again noted to be experiencing depression. (Tr. 567–67) But at that same examination, medical personnel noted no anxiety, depression, or sleep disturbances. *Id.* Plaintiff's mood was also normal, and she did not report fatigue. (Tr. 568–69)

Furr examined plaintiff again on February 4, 2010. (Tr. 562) Though plaintiff had a diagnosis of depression, she reported to Furr that she was not then suffering from anxiety, depression, or disturbed sleep. (Tr. 564) Plaintiff's mood was normal. *Id.* Furr noted the same absence of symptoms at follow-up appointments on February 11 and March 4, 2010. (Tr. 557–60) No medical evidence of record speaks to plaintiff's mental health conditions from April 2010 through September 2010.

On October 20, 2010, Hunter diagnosed plaintiff with depression. (Tr. 605) However, Hunter remarked that plaintiff's mood, memory, judgment, and cognition were all within normal limits, and her concentration level was focused. *Id.* She was cooperative. *Id.* Her speech pattern was normal, and her ability to process her present situation was within normal limits, with no delusions or other sensory defects. *Id.*

Plaintiff's symptoms were exactly the same at twelve monthly follow-up appointments through September 2011, with the sole exception of October 26, 2010, when plaintiff's mood was noted as depressed and anxious. (Tr. 594–607) At no point did plaintiff's therapist document any limitations in her daily activities as a result of her depression. *See id.* Rather, she was experiencing "boredom." (Tr. 604)

On November 1, 2010, plaintiff was sought emergency treatment for an unrelated condition. (Tr. 592) At the emergency room, medical personnel remarked that plaintiff appeared to have an anxiety disorder. *Id.* On November 2, 2010, December 14, 2010, and January 11, 2011, during plaintiff's follow-up visits for medication refills, medical personnel indicated she was awake and alert,

normally oriented, with normal mood, and not experiencing any mental health symptoms. (Tr. 625–28, 632–34)

On March 8, 2011, plaintiff sought refills of her prescription medications. (Tr. 620–21) She was in no acute distress. (Tr. 621) Her ability to communicate, mood, and affect were all normal. *Id.* According to medical professionals, plaintiff was experiencing "no psychotic thoughts," with normal association, judgment, "motor behavior, speech, thought processes, attitude, and pain behavior." *Id.*

Plaintiff tested negative for illegal drug use on March 2, 2011. (Tr. 412, 588) On April 26, Phillips examined plaintiff for complaints of migraine headaches. (Tr. 596) Plaintiff did not report any symptoms of anxiety, depression, or insomnia. *Id.* Her psychiatric evaluation was in all respects normal. *Id.* At an examination on May 2, plaintiff's mood and affect were normal, and her memory was not impaired. (Tr. 617–18) On medication, her mood was "better" and her sleep pattern was "ok." (Tr. 619) Her familial and social relationships had improved. *Id.*

On June 28, 2011, plaintiff's memory, mood, and affect were normal, and she was alert. (Tr. 614–15) Plaintiff remarked that her medications were improving her daily functioning and activities, as well as her sleep pattern. (Tr. 616) The same was true on July 26, 2011. (Tr. 613) According to Lee Schuler, P.A., on August 23, 2011, plaintiff was awake and alert. (Tr. 609–13) Her memory was normal, as were her mood and affect. *Id.* On September 20, 2011, plaintiff told medical personnel that her mood was "better" and that she was experiencing improved social and familial relationships. (Tr. 608–09, 641–44)

Though Reed acknowledged plaintiff's diagnosis of depression, (Tr. 662), on February 8, 2011, determined plaintiff was not experiencing any fatigue,

depression, insomnia, or anxiousness.  (Tr. 656, 662)  The same was true during another examination on February 15.  (Tr. 654)  Reed also found no impairment in plaintiff's judgment, memory, speech, or mood on March 2.  (Tr. 653)

On April 20, 2011, Reed observed "no known or apparent agitation, anxiety, [or] depression."  (Tr. 651)  The results were the same on June 30 with additional remarks that plaintiff had no detectable memory, judgment, mood, or speech impairment.  (Tr. 650)  On August 30 Reed noted that plaintiff had been prescribed medications for anxiety and insomnia, though without any notation that plaintiff is limited by her anxiety or other conditions.  (Tr. 647)

## 2. **Post-Application Records**

On October 24 and November 21, 2011, plaintiff sought refills of her prescriptions.  (Tr. 636, 638)  On both occasions she appeared well-developed and well-nourished, "easily responsive" to visual, verbal, and tactile stimulation, and well-oriented and cooperative.  (Tr. 636, 639)  Her ability to communicate was normal.  (Tr. 636, 639)  Plaintiff was awake and alert, without memory impairments, and her mood was normal and appropriate, without noted depression or anxiety.  (Tr. 637, 639)  In addition, plaintiff had a "pretty good" or "better" ability to perform activities of daily living of every type, including maintaining appropriate social interaction, and mood.  (Tr. 638, 641)  Similarly, on November 29, 2011, Reed observed plaintiff and noted no agitation, anxiety, depression, and no impairments to her judgment, memory, mood, or speech.  (Tr. 646)

On December 12, 2011, James W. Morgan, Ph.D., completed a Psychiatric Review Technique of plaintiff's conditions.  (Tr. 677)  Dr. Morgan determined that, at that time, plaintiff's sole medically diagnosable mental health condition was

major depressive disorder, which was not severe.  (Tr. 677–80)  Specifically, Dr. Morgan did not note any medically diagnosable memory impairment, mood disturbance, impaired impulse control, or difficulty concentrating.  *Id.*

According to Dr. Morgan, plaintiff's bipolar disorder was not fully symptomatic.  (Tr. 680)  He also did not diagnose any cognitive impairment, speech impairment, or anxiety disorder.  (Tr. 680–81)  Dr. Morgan determined that plaintiff's major depressive disorder caused only mild restriction in her activities of daily living, mild difficulties in her ability to maintain social functioning, and mild difficulties in maintaining concentration, persistence, and pace.  (Tr. 685) However, Dr. Morgan did not indicate whether or not plaintiff had suffered episodes of decompensation.  *Id.*

Reviewing the medical evidence of record, Dr. Morgan noted that plaintiff's attention and concentration were focused, and her judgment, memory, attitude, activity level, affect, mood, and speech were all normal.  (Tr. 687)  Dr. Morgan also remarked that plaintiff had, "not made any complaints that are documented regarding concerns of anxiety or depression."  *Id.*  Plaintiff got along with others, had friends, and admittedly could perform all activities of daily living without assistance.  *Id.*  Based on that evidence, Dr. Morgan opined that plaintiff's claim that anxiety and depression limit her ability to work is only partially credible.  *Id.* He further opined that those conditions are non-severe because plaintiff "continued to function" and "does not report any concerns that are documented."  *Id.*

Following Dr. Morgan's report, records in evidence before the ALJ detail plaintiff's counseling treatment from March 26, 2012, through May 13, 2013.  (Tr. 694–740)  On March 26, 2012, Stacy Scott, a licensed clinical social worker,

afforded plaintiff therapy for depression and methamphetamine abuse. (Tr. 696) At that time, Scott recommended no additional medications to treat plaintiff's major depressive disorder. *Id.* She was advised to continue therapy to treat her depression and to abstain from drug use. *Id.*

Licensed clinical social worker Teresa Nichols examined plaintiff the same day. (Tr. 697) Nichols reported that plaintiff was irritable, but not depressed or anxious. *Id.* Her thought content was unrealistic, but she was coherent, with appropriate speech, no memory impairment, and fair judgment and insight. *Id.* She was restless, but well oriented. *Id.* Nichols opined that plaintiff was suffering from Axis I conditions of major depressive disorder, which was severe, and moderate amphetamine abuse. *Id.* On Axis IV, plaintiff had severe, enduring problems with her primary support group, and moderate, enduring problems relating to her social environment, occupational problems, and other unspecified psychosocial and environmental problems. *Id.*

Plaintiff told Nichols: "I guess I need help because I have not been making good decisions at all." (Tr. 698) She sought medication and counseling for "trouble staying asleep." *Id.* She described her relationship with her husband, from whom she was then separated, as, "not very loving" and, "a roller coaster." (Tr. 698–99) Plaintiff admitted to using methamphetamine. (Tr. 699) She complained of having "symptoms of depression" and "family problems," with "traumatic experiences, anxiety, sleep problems, and mania." *Id.* However, plaintiff admitted to Nichols that she was not taking any of her prescription medications. (Tr. 700) Noting her past psychiatric hospitalization for suicidal ideation, plaintiff also denied actually

having attempted suicide. *Id.* But plaintiff averred she thinks about suicide between once and twice per week. *Id.*

Plaintiff was stressed about living with her mother, "not knowing what to do or where to go," not working, having "difficulty finding a job," and not having money. (Tr. 701) She enjoyed "being with her children" and described herself as, "good with people." *Id.* Plaintiff also remarked that people trust her easily, as she is nice and "pretty outgoing." *Id.* Plaintiff told Nichols that she had applied to work at a nursing home and had "applied for disability due to back problems." (Tr. 702)

Scott recommended that plaintiff follow-up for additional counseling. *Id.* Plaintiff articulated two primary goals for her therapy: "quit doing drugs and mak[e] better decisions." *Id.* Plaintiff also remarked that her depression is "situational," and told Nichols that "she can control the anxiety on her own." *Id.*

At an April 17, 2012, counseling session with Scott, plaintiff's mood was depressed and anxious. (Tr. 695) Plaintiff admitted to having used methamphetamines one week prior. *Id.* Scott observed that plaintiff's behavior was appropriate, her thoughts were appropriate and congruent, her speech was appropriate, and she appeared to have fair insight and judgment, without impaired memory. *Id.*

However, on April 27, 2012, plaintiff was referred to an emergency appointment for psychiatric services after an unidentified person contacted a crisis hotline to report plaintiff's threats of self-harm. (Tr. 720) Plaintiff was admitted to the hospital on a voluntary basis for in-patient psychiatric treatment from April 27 until May 4, 2012. (Tr. 769) She was treated by Margaret Singleton, M.D. (Tr. 770) Plaintiff's chief complaints were "depression and overdosing on her

medications[,] secondary to a break up with her boyfriend and other family situations." (Tr. 769)

Dr. Singleton diagnosed plaintiff with a major depressive disorder, obsessive compulsive disorder, and a "questionable history of bipolar disorder." *Id.* Plaintiff responded well to medications, as well as individual and group counseling. *Id.* She "slow[ed] down" following administration of Lithium, for hyperactivity, as well as Luvox (Fluvoxamine) and Anafranil (Clomipramine), for obsessive compulsive disorder. *Id.* On medication she was "somewhat calm, more focused and better able to tolerate her stay" in the hospital. *Id.*

During initial group counseling plaintiff was sad, tearful, restless, unable to focus, and she demonstrated poor concentration. *Id.* After nine days of treatment and medication, however, her participation was high, she was able to set goals for herself, and she had better and increased socialization with her peers. *Id.* Her condition on discharge was "stable". (Tr. 769–70) Dr. Singleton's recommended course of treatment was continued therapy and medication, with no noted restrictions on plaintiff's activities. *Id.*

Upon discharge on May 4, plaintiff was able to communicate, read, write, understand and remember instructions, and was free of severe pain. (Tr. 782) She had a regular diet, a good appetite, and was discharged to home with no noted restrictions on her ability to independently carry out her activities of daily living. *Id.* She was instructed to continue taking prescribed medications and to follow-up for additional therapy. *Id.*

Dr. Palepu's notes of plaintiff's psychiatric counseling on May 9, 2012, are in many respects illegible. (Tr. 721) Plaintiff was stressed because of issues with her

relationships and reported having suicidal thoughts. *Id.* However, she appeared clean and appropriately groomed, with good eye contact, and normal speech. *Id.* Dr. Palepu remarked that plaintiff's mood was positive, and her affect was congruent, without noted symptoms of depression. *Id.* According to Dr. Palepu, plaintiff's judgment was intact, and she had only moderate limitations in her mood disorder. *Id.*

Scott's next therapy session with plaintiff occurred on May 15, 2012. (Tr. 719) Her mood was appropriate, not depressed or anxious. *Id.* That was also true of her affect, behavior, thought content, and speech. *Id.* Her thought processes appeared coherent, and she had fair insight and judgment, with no memory problems. *Id.* Plaintiff told Scott that she felt, "great." *Id.*

Similarly, on May 30, 2012, plaintiff was anxious but not depressed during therapy. (Tr. 718) Her behavior, thoughts, and speech were appropriate. *Id.* Her thoughts were also coherent, and consistent with fair judgment and insight. *Id.* Her memory was normal. *Id.* Plaintiff was stressed and confused about "relationship issues" with her husband and grief over the death of one of her grandparents. *Id.* Her prescribed course of treatment was continued therapy, without noted limitations to her daily routine. *Id.*

On June 5, 2012, Rosemary Collins, a psychiatric nurse practitioner, examined plaintiff as a follow-up to her release from the hospital. (Tr. 736) Plaintiff remarked that her suicidal ideation and decision "to hurt herself" prior to her hospitalization stemmed from an argument with her ex-boyfriend. *Id.* She told Collins that "she has always had depression and anxiety." *Id.*

Collins determined plaintiff was not suffering from any psychosis. *Id.* Plaintiff complained of being "paranoid all the time" and not having any friends. *Id.* She denied suicidal ideation. *Id.* Plaintiff admitted noncompliance with her medications, including prescriptions for Lithium, Prozac (Fluoxetine), and Anafranil. *Id.* According to Collins, plaintiff's "tentative diagnosis" was, "Major Depression vs. Bipolar and OCD." *Id.* Plaintiff averred she "just needs help" because she "is not making good decisions and she keeps falling for the wrong type of people." *Id.*

Collins remarked that plaintiff tested positive for substance abuse, mania, and sleep problems. (Tr. 736–37) She admitted using methamphetamines as recently as six weeks earlier. (Tr. 736) Collins described plaintiff as "fidgety," which plaintiff attributed to anxiety. (Tr. 738) Plaintiff's mood was "somewhat sarcastic and aloof[]." *Id.* She exhibited sarcasm and irritation with the questions being asked of her. *Id.* For example, she was directed to cease using her phone throughout the therapy session, but she refused to do so. *Id.* Collins remarked that plaintiff did "not appear to be manic or hypo[-]manic." *Id.*

Plaintiff's immediate memory was adequate, but her long-term memory was "questionable based upon recall of important details of her own history." *Id.* Her concentration was poor. *Id.* Plaintiff appeared to have low-average intelligence "based upon" plaintiff's "vocabulary and general fund of information," but "without being formally tested." *Id.* She seemed immature, according to Collins, though a formal diagnosis on Axis II was deferred. *Id.*

Plaintiff was "verbalizing that she has Bipolar," but she was "not taking a mood stabilizer" and told Collings that, "she does not wish to take one." *Id.* Though plaintiff was taking her prescribed Trazodone to manage her sleep pattern,

she was not taking other medications at that time, and refused to take them. (Tr. 739) It was "unclear" whether plaintiff had been sober. (Tr. 738) Collins was concerned that plaintiff "will not be compliant with medications." *Id.* Collins determined that plaintiff was to be "tapered off of" Xanax because of her recent drug use. *Id.*

Further, Collins wrote that she would "more than likely not continue" providing plaintiff therapy, unless she was "willing to actively be involved in individually therapy" and medication management. *Id.* Though plaintiff had prior diagnoses of methamphetamine abuse and a major depressive disorder, Collins was determined to further evaluate whether plaintiff merely had a not otherwise specified mood disorder. *Id.* Additional evaluation was warranted, she remarked, to rule out major depressive disorder, bipolar disorder, and a substance-abuse-induced mood disorder. (Tr. 738–39) Collins prescribed additional therapy and a reduction in plaintiff's Xanax prescription, with no restrictions on her daily activities. (Tr. 739) Syed Sayeed, M.D., reviewed and approved that assessment and treatment plan. *Id.*

On June 8 and June 19, 2012, Collins held additional therapy sessions with plaintiff, at which time she was not taking any prescription medications. (Tr. 707) Her Axis I diagnoses included a mood disorder and moderate methamphetamine abuse. *Id.* Collins noted no signs of recurrent major depressive disorder, bipolar disorder, or a substance-induced mood disorder, and she sought to rule out those conditions. *Id.* Collins recommended plaintiff adhere to her prescribed medication and therapy regimens. *Id.*

On July 16, 2012, plaintiff was "aloof" and fidgety during therapy. (Tr. 734) She was goal-directed, but focused on her relationships. *Id.* She had limited judgment and insight, though Collins noted no psychosis. *Id.* Plaintiff was again counseled to discontinue using non-prescription drugs. *Id.* Collins determined further investigation was warranted to assess whether plaintiff was suffering from bipolar disorder. *Id.* Collins remarked that plaintiff was not experiencing anxiety or depression. *Id.* She also suggested plaintiff may no longer need Xanax, though a follow-up appointment would be needed to confirm that. (Tr. 734–35)

On August 27, 2012, plaintiff attended therapy. (Tr. 732) She was not depressed. *Id.* On August 29, 2012, plaintiff dropped out of therapy after having attended four counseling sessions and making "no progress." (Tr. 717) She returned on November 1, 2012, and Collins noted her noncompliance with prescription medications. (Tr. 730) Her judgment and insight were "limited," and her thought processes were "disjointed." *Id.* However, plaintiff's mood was euthymic, rather than depressed, and her affect was congruent. *Id.* Her thoughts were goal-directed, and she was not suffering from any delusions or suicidal ideations. *Id.*

On November 7, 2012, plaintiff sought crisis psychiatric treatment. (Tr. 713) Plaintiff told the intervention therapist, Angela Lutmer, that she was suicidal and had been having such thoughts for the past few months. (Tr. 714–15) She thought about taking "a whole bunch of pills," though she admittedly did not have the means at the time to do so. (Tr. 715) According to Lutmer, plaintiff had "no current plan or intent" to commit suicide. (Tr. 716)

Rather, Lutmer suggested plaintiff may have been under the continued effects of methamphetamines. (Tr. 715) She admitted to using "a lot" of methamphetamine for the "past couple months," including the previous evening. *Id.* Plaintiff reported her sleeping habits were "okay" on medication if she was not using methamphetamine. *Id.* She exhibited symptoms of obsessive compulsive disorder and described herself as "never really happy." *Id.* Lutmer recommended therapy and substance abuse treatment. *Id.*

On December 20, 2012, licensed clinical social worker Kellee Foote examined plaintiff and determined she continued to experience a substance-induced mood disorder, amphetamine dependence, and that she was abusing cannabis. (Tr. 705) Foote recommended bi-weekly therapy to learn coping mechanisms to address her depression and anxiety, and that she refrain from substance abuse while continuing her prescription medications. (Tr. 705–06)

On January 7, 2013, plaintiff attended therapy. (Tr. 711) Foote remarked that plaintiff's mood was depressed and her thoughts were loosely associated, but her thought content and behavior was appropriate. *Id.* Her speech was rapid, but with slowed motor activity. *Id.* She had poor judgment and insight. *Id.* However, her memory was not impaired and she was well oriented. *Id.* According to Foote, plaintiff was "not invested in participating in" therapeutic activities to address her depressed and "tearful" mood. *Id.*

Foote also remarked that plaintiff may not have been sober at the therapy session, and recommended plaintiff attend in-patient treatment for substance abuse. *Id.* Foote informed plaintiff that she must be sober at all future therapy sessions. *Id.* Plaintiff admitted that she had "been using crack every day since her

last" therapy session.  *Id.*  Plaintiff refused to confirm whether or not she would accept Foote's referral to drug treatment.  *Id.*

On January 31, 2013, plaintiff attended therapy following her husband's announcement that he had filed for divorce and for custody of their children.  (Tr. 728)  But plaintiff did not describe herself as depressed.  *Id.*  Her judgment was poor, as she was using methamphetamine.  *Id.*  Her primary concerns centered on her relationship with her children, her husband, and her boyfriend.  *Id.*  Plaintiff was anxious and nervous, but her "worries appear[ed] to be fact based" with regard to her current "legal problems."  (Tr. 729)

Records from a therapy session on February 28, 2013, show that plaintiff had been skipping therapy.  (Tr. 727)  She complained of claustrophobia while driving and obsessive compulsive disorder.  *Id.*  Plaintiff admitted to having been using methamphetamines for the past two months.  *Id.*  She was experiencing "paranoia" and was "upset about not seeing her children."  *Id.*  However, her mood was euthymic, and she was not depressed, with goal-directed thought processes.  *Id.* In addition, plaintiff was not taking her prescribed medications.  *Id.*

On March 6, 2013, Dr. Palepu noted that plaintiff was depressed, with poor judgment and insight.  (Tr. 725)  However, her thought processes were goal directed, and Dr. Palepu's only recommendation appeared to be that plaintiff should continue regular therapy and her existing medications.  *Id.*  Likewise, on April 3, 2013, Dr. Palepu remarked that, other than plaintiff's diagnosed moderate depression, she had no other extant mental health conditions.  (Tr. 723)  Unlike one month earlier, her mood was euthymic; she was not depressed.  *Id.*  Her judgment was intact.  *Id.*

On April 4, 2013, Dr. Palepu referred plaintiff for additional therapy and psychiatric support.  (Tr. 708–09)  He diagnosed her with recurrent major depressive disorder, which was moderate, and methamphetamine abuse.  (Tr. 708)  Dr. Palepu ruled out a mood disorder, borderline personality disorder, and histrionic personality disorder.  *Id.*  According to Dr. Palepu, plaintiff had depression with multiple stressors, for which he recommended therapists assist plaintiff with developing coping skills to decrease her symptoms.  (Tr. 709)

As Dr. Auvenshine noted, on July 30, 2013, Dr. Jordan conducted a full neuropsychological evaluation of plaintiff at the behest of the Social Security Administration.  (Tr. 742)  That evaluation included a review of plaintiff's records and a clinical interview with plaintiff, including tests of her mental status.  (Tr. 743)  Dr. Jordan examined plaintiff for, as relevant here, complaints of anxiety attacks, fatigue, and depression.  (Tr. 742)

As described by Dr. Jordan, plaintiff reported a "history of polysubstance abuse (methamphetamine, cocaine, marijuana) with very limited periods of sobriety."  *Id.*  Plaintiff told Dr. Jordan that she had, "been off all illegal substances for the past two months."  *Id.*  Dr. Jordan remarked: "I would characterize her remission as in the early stages; I would not anticipate full cognitive recovery from this abuse for the next year."  *Id.*

According to Dr. Jordan, though plaintiff had been diagnosed with major depression, she instead "appear[ed] to be under treatment for bipolar disorder with mood stabilizing medications."  *Id.*  Dr. Jordan opined: "at this time, her psychiatric status appears fairly well-controlled."  *Id.*  Additionally, Dr. Jordan noted, plaintiff's "history would be consistent with bipolar II disorder, but [her] current severity is

mild." *Id.* Further, though plaintiff alleged cognitive limitations, Dr. Jordan observed "only some mild slowing of cognition and increased forgetting rate on some of the subtests of the memory testing." *Id.* Dr. Jordan determined that those "problems are more likely related to her substance abuse history (as well as the early status of her sobriety) and her mood disorder, rather than a progressive neurological condition." *Id.*

Dr. Jordan determined plaintiff had no limitations in her ability to perform activities on schedule and follow an ordinary routine. (Tr. 743) She had only mild restrictions in her ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; or maintain attention and concentration for extended periods. *Id.* Plaintiff also could work in proximity to others without distraction, make simple work-related decisions, and complete a normal workday without interruptions from psychologically-based symptoms. *Id.*

According to Dr. Jordan, plaintiff would be able to ask simple questions or request assistance as needed, with no limitation accepting instructions or criticism from supervisors. *Id.* She would also be able to get along with peers at work, and respond appropriately to changes in the work setting. *Id.* Plaintiff had no impairment in her awareness of normal hazards and the appropriate precautions to counter them. *Id.* She could set realistic goals and make independent plans. *Id.*

Dr. Jordan also opined that plaintiff had no marked restrictions. *Id.* Further, her only moderate restrictions were in the ability to perform at a consistent pace and to interact appropriately with the general public. *Id.* First noting that plaintiff "has apparently never held a competitive job," Dr. Jordan remarked that plaintiff

indicated only "mildly impaired capacity to maintain her normal household activities, depending on her mood status." *Id.* Dr. Jordan's impression was that plaintiff suffers from polysubstance abuse, in early remission, and Bipolar II disorder, and is currently mildly depressed. *Id.*

Dr. Jordan also completed a Medical Source Statement the same day. (Tr. 748–50) Consistent with his analysis, he remarked that plaintiff's "mild memory problems, poor stress tolerance, and slowed mentation" cause only mild difficulties understanding, remembering, and carrying out simple instructions, making simple work-related judgments, and understanding and remembering complex instructions. (Tr. 748) Those conditions would cause her no more than moderate difficulties carrying out complex instructions and making complex work-related judgments. *Id.* Likewise, according to Dr. Jordan, plaintiff's depression and anxiety would cause her only mild difficulties interacting with the public, supervisors, and co-workers, and moderate difficulties responding to usual work situations and changes in work-setting routines. (Tr. 749) Dr. Jordan also opined that plaintiff's history of methamphetamine and cocaine abuse may have still been affecting her conditions. *Id.* Thus, he explained, plaintiff's cognition and mood would be expected to improve over the next year, if she remained drug free. *Id.*

On August 12, 2013, plaintiff was again admitted to the hospital for in-patient psychiatric treatment stemming from "complaints of depression" and "suicidal thoughts," with an alleged onset two weeks before she was admitted. (Tr. 754) She reported "increased depressive symptoms with thoughts of harming [her]self, [and] planned to overdose on medication." *Id.*

Dr. Pang observed that plaintiff was well oriented and fairly groomed.  *Id.*
But she exhibited symptoms of anxiety and depression, with a flat affect.  *Id.*
Plaintiff's insight and judgment were fair.  *Id.*  Tests revealed she was not using
illegal drugs.  (Tr. 764)  She participated in individual and group therapy, and was
discharged after four days, on August 16.  (Tr. 754)

Dr. Pang diagnosed plaintiff with a major depressive disorder, which was
recurrent and severe, but without psychotic behaviors.  (Tr. 767)  Accompanying
that diagnosis were "[n]o activity limitations."  (Tr. 766)  Plaintiff was instructed to
continue her existing medications, with a renewed prescription for Celexa, to
maintain a regular diet, and to continue therapy.  (Tr. 754, 766–67)

### 3. <u>Post-Decision Records</u>

The Appeals Council considered new evidence submitted by plaintiff following
the ALJ's decision.  (Tr. 2, 4)  That evidence consisted of a Mental Impairment
Questionnaire completed by Dr. Palepu on February 21, 2014.  (Tr. 783–88)
Portions of Dr. Palepu's statement are illegible.  According to Dr. Palepu, plaintiff is
"not very compliant" with her medications.  (Tr. 783)  The doctor appears to have
written that plaintiff is irritable, sad, and depressed, with poor insight and
judgment.  *Id.*  He may also have written that her prognosis was fair.  *Id.*

In any event, Dr. Palepu was asked to identify all of plaintiff's extant signs
and symptoms.  (Tr. 784)  Dr. Palepu checked boxes indicating the following
symptoms: loss of interest in almost all activities, decreased energy, thoughts of
suicide, feelings of guilty or worthlessness, mood disturbances, difficulty thinking or
concentrating, paranoia, easy distractibility, memory impairment, and a disrupted
sleep pattern.  *Id.*  However, Dr. Palepu did not indicate plaintiff's affect was

inappropriate, that she experienced persistent anxiety or disturbances in her mood or affect, or mental retardation, emotional withdrawal or isolation. *Id.* She was not experiencing bipolar disorder or any organic dysfunction of the brain. *Id.*

Further, Dr. Palepu did not indicate that plaintiff's thinking is illogical. *Id.* Though he checked the box to denote plaintiff is paranoid, Dr. Palepu did not report that paranoia results in pathologically inappropriate suspicions or hostility. *Id.* According to Dr. Palepu, plaintiff is not hyperactive or manic, nor is she disoriented or delusional. *Id.* Her perception and thinking are undisturbed. *Id.*

Plaintiff suffers from no ingrained, maladaptive patterns of behavior. *Id.* She does not have severe panic attacks. *Id.* Despite two hospitalizations for suicidal ideation that allegedly stemmed from familial and romantic relationship difficulties, according to Dr. Palepu, plaintiff does not experience intense and unstable interpersonal relationships, or impulsive and damaging behavior. *Id.* She was not noted to have any communication difficulties or loss of intellectual ability. *Id.*

As to plaintiff's ability to perform unskilled work, Dr. Palepu opined that plaintiff is able to remember work-like procedures. (Tr. 785) She can also understand, remember, and carry out very short and simple instructions; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; and ask simple questions or request assistance. *Id.* Further, plaintiff would be expected to both accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in work routine, as well as recognize and take precautions from normal hazards. *Id.*

However, according to Dr. Palepu, plaintiff is seriously limited, but not precluded, from maintaining attention for two-hour segments, maintaining regular attendance and punctuality, sustaining an ordinary routine without special supervision, or working in coordination with or proximity to others without being unduly distracted. *Id.* She is also seriously limited, but not precluded, from performing at a consistent pace without an unreasonable number and length of rest periods, getting along with her peers without unduly distracting them or exhibiting behavioral extremes, or dealing with natural work stress. *Id.* The questionnaire tasked Dr. Palepu to explain any limitations he marked as serious or more than serious, and he was requested to include the medical and clinical findings that supported his assessment. *Id.* He did not respond to that question. *Id.*

Dr. Palepu also opined that plaintiff's ability to perform semiskilled and skilled work was limited, but satisfactory, with regard to understanding, remembering, and carrying out detailed instructions. *Id.* But, the doctor remarked, plaintiff was seriously limited, though not precluded, from setting realistic goals or making plans independently of others, or from dealing with the stress of semiskilled and skilled work. *Id.* Again, though requested to do so, Dr. Palepu provided no explanation or medical and clinical findings to support this assessment. *Id.*

Dr. Palepu also opined that plaintiff has a limited but satisfactory capacity to interact appropriately with the general public, adhere to basic standards of neatness and cleanliness, and use public transportation. (Tr. 786) According to Dr. Palepu, plaintiff is seriously limited, but not precluded, from maintaining socially appropriate behavior and traveling to unfamiliar places. *Id.* Dr. Palepu offered no explanation or medical and clinical findings to support those opinions. *Id.*

Dr. Palepu also remarked that plaintiff does not have a low IQ or reduced intellectual functioning, and her psychiatric conditions do not exacerbate any of her physical conditions. *Id.* According to Dr. Palepu, plaintiff has moderate limitations in her activities of daily living and moderate difficulty maintaining social functioning. *Id.* She also has moderate difficulty maintaining concentration, persistence, and pace. *Id.* Dr. Palepu also remarked that plaintiff had experienced one or two episodes of decompensation within the last twelve months, each of at least two weeks in duration. *Id.* But Dr. Palepu did not provide details about those episodes of decompensation. *Id.* Finally, Dr. Palepu opined that plaintiff's mental impairments would cause her to miss work about four days per month. (Tr. 788)

Other than the Mental Impairment Questionnaire, no treatment notes or other medical evidence was submitted by Dr. Palepu post-dating the ALJ's decision, which incorporated all other medical evidence of record. After considering Dr. Palepu's statement and plaintiff's brief in support, the Appeals Council denied plaintiff's request to review the ALJ's decision. (Tr. 1–4)

### III. **The ALJ's Decision**

In the decision issued on February 6, 2014, the ALJ made the following findings:

1. Plaintiff has not engaged in substantial gainful activity since October 6, 2011, the application date.

2. Plaintiff has the following severe impairments: (1) disorder of the back and (2) migraine headaches.

3. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. Plaintiff has the RFC to perform light work, as defined in 20 C.F.R. § 416.967(b), except that she can lift, carry, push, and pull 20 pounds

occasionally and 10 pounds frequently; she can sit, stand, or walk six hours in an eight-hour workday for a total of eight hours in an eight-hour workday; she can occasionally climb, balance, stoop, crouch, kneel, and crawl; she must be limited in her exposure to ladders, ropes, and scaffolds; and she should have no concentrated exposure to moving machinery or unprotected heights.

5.   Plaintiff has no past relevant work.

6.   Plaintiff was born on July 2, 1982, and was 29 years old, which is defined as a younger individual age 18–49, on the date the application was filed.

7.   Plaintiff has at least a high school education and is able to communicate in English.

8.   Transferability of job skills is not an issue because plaintiff does not have past relevant work.

9.   Considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

10.  Plaintiff has not been disabled within the meaning of the Social Security Act since October 6, 2011, the date the application was filed.

(Tr. 11–24)

## IV.   <u>Legal Standards</u>

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." *Long*, 108 F.3d at 187. "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the

decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotation marks and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. *See* 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. *Pate-Fires*, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. *Id.*

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant

evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations." *Moore*, 572 F.3d at 523 (quotation marks and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Buckner*, 646 F.3d at 558 (quotation marks and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" *Id.* (quoting *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether the claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [the claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her

RFC and establish that she cannot return to her past relevant work. *Moore*, 572 F.3d at 523; *accord Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); *see also* 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.     Discussion

Plaintiff presents several interrelated questions for review. As relevant here, *inter alia*, she argues the Appeals Council erred by denying review of the ALJ's decision after having considered Dr. Palepu's Mental Impairment Questionnaire. "When the Appeals Council denies review of an ALJ's decision after reviewing new evidence, [courts] 'do not evaluate the Appeals Council's decision to deny review, but rather [they] determine whether the record as a whole, including the new evidence, supports the ALJ's determination.'" *McDade v. Astrue*, 720 F.3d 994, 1000 (8th Cir. 2013) (quoting *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000)). Consequently, the question is whether the ALJ committed reversible error by not reviewing, assessing the credibility of, and considering any credible opinions gleaned from Dr. Palepu's Mental Impairment Questionnaire.

Plaintiff contends the ALJ's failure to consider Dr. Palepu's opinion undermines his determination that none of plaintiff's mental impairments are

severe at Step 2. Even if that were not so, she also presses, the ALJ's failure to consider Dr. Palepu's opinion obviates his RFC assessment that plaintiff has no mental limitations caused by any severe or non-severe mental impairment, or combination of such impairments. Finally, according to plaintiff, that purportedly flawed RFC undermines the ALJ's determination at Step 5 that plaintiff can perform other work, because that finding was based on a concomitantly flawed hypothetical posed to the vocational expert, which included no such mental limitations.

Defendant counters that the failure to consider Dr. Palepu's opinion does not require remand. Addressing only the merits of the doctor's opinion, defendant concedes it is "new and material" evidence, which in turn requires the Court to examine it here. *See id.* (citing 20 C.F.R. § 404.970(b), and *Perks v. Astrue*, 687 F.3d 1086, 1093 (8th Cir. 2012)); *Hepp v. Astrue*, 511 F.3d 798, 808 (8th Cir. 2008); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1025 (8th Cir. 2002). Relying on *McDade*, defendant contends reversal is not required because, if the ALJ had considered Dr. Palepu's opinion, he might have determined it was less than fully credible—and thus not entitled to controlling weight—for myriad reasons that may have been legally sufficient. But *McDade* does not hold as much. Rather, in *McDade*, the Eighth Circuit concluded, "the ALJ's determination was supported by the records as a whole, including the post-hearing evidence," the opinion of the claimant's treating physician, because that opinion was "entirely consistent with the ALJ's determination" as to the claimant's limitations. *McDade*, 720 F.3d at 1000.

Here, in contrast, Dr. Palepu opined that plaintiff has severe mental impairments and is irritable, sad, and depressed, with poor insight and judgment. (Tr. 783) Dr. Palepu noted plaintiff's thoughts of suicide, mood disturbances,

difficulty thinking and concentrating, and paranoia. (Tr. 784) He remarked that she was easily distractible and suffers from impaired memory. *Id.*

According to Dr. Palepu, those symptoms would manifest even if plaintiff was called upon to perform only unskilled work. *Id.* Specifically, among other things, those symptoms would render plaintiff seriously limited in her ability to maintain attention for two-hour segments, maintain an ordinary routine without supervision, work in proximity to others without undue distraction, or perform at a consistent pace. *Id.*

Dr. Palepu also opined that plaintiff has moderate limitations in her activities of daily living and moderate difficulty maintaining social functioning, with moderate difficulty maintaining concentration, persistence, and pace. (Tr. 786) Dr. Palepu additionally remarked that plaintiff had experienced one or two episodes of decompensation within the last twelve months, each of at least two weeks in duration. *Id.* Finally, Dr. Palepu opined that plaintiff's impairments would cause her to miss work about four days per month. (Tr. 788)

On their face and if adjudged fully credible, Dr. Palepu's opinions are inconsistent with the ALJ's finding that plaintiff has no severe mental impairment, singularly or in combination, at Step 2. Nor is Dr. Palepu's opinion consistent with the ALJ's finding that plaintiff's RFC is not cabined by any mental limitations. Consequently, Dr. Palepu's opinion also is not consistent with the ALJ's hypothetical to the vocational expert at Step 5, which incorporated that RFC.

Therefore, whether Dr. Palepu's opinion is fully credible is a critical issue. Dr. Palepu was plaintiff's treating psychiatrist. "A treating physician's opinions must be considered along with the evidence as a whole . . . ." *Krogmeier*, 294 F.3d at 1023.

When a treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)(2)). An examining physician's opinion, however, neither inherently or automatically has controlling weight, and "does not obviate the need to evaluate the record as a whole." *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014) (internal quotation marks and citations omitted). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quotation marks and citation omitted). Moreover, an ALJ is "entitled to give less weight to" the opinion of a treating doctor where the doctor's opinion is "based largely on" the plaintiff's "subjective complaints rather than on objective medical evidence." *McDade*, 720 F.3d at 999 (quotation marks and citation omitted).

An ALJ may not substitute his own opinions for the opinions of medical professionals. *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990); *see also Pate-Fires*, 564 F.3d at 946–47 (ALJs may not "play doctor"). However, an ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment." *Qualls v. Apfel*, 158 F.3d 425, 428 (8th Cir. 1998) (quotation marks and citation omitted). Ultimately, the ALJ must "give good reasons" to explain the weight given the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2).

The Commissioner correctly points out that for any number of reasons the ALJ could have considered Dr. Palepu's opinion and determined it was less than fully credible. *See, e.g.*, *Wildman*, 596 F.3d at 964. Having considered and rejected some or even all of Dr. Palepu's opinions based on such findings, the ALJ in turn might have drawn the same conclusions at Steps 2 through 5. But the Commissioner fails to acknowledge that the ALJ in fact made no such credibility determination, because he never considered Dr. Palepu's opinion. Of course, that also means the ALJ did not offer any explanation for affording the doctor's opinion less than controlling weight. *See* 20 C.F.R. § 404.1527(c)(2); *Pate-Fires*, 564 F.3d at 946–47; *Ness*, 904 F.2d at 435.

Further, the Court is forbidden from stepping into the ALJ's shoes to shore up his opinion by making such credibility determinations in the first instance, even if the law might have amply supported such findings if made by the ALJ. *See Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004) ("We will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility."). In other words, contrary to the Commissioner's suggestion, the Court cannot here first render a credibility determination never made by the ALJ and then affirm its own finding. Because the Court is foreclosed from taking the first step, it cannot affirm the second. This also explains why the ALJ's failure to make any credibility determination with respect to the opinion of plaintiff's treating psychiatrist cannot be harmless error. *See Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (explaining harmless error).

Therefore, the Court can affirm the ALJ only if his decision would stand were Dr. Palepu's opinions both fully credible and assigned controlling weight. But, as

explained, if Dr. Palepu's opinions were so treated, the ALJ could not have found that plaintiff does not have any severe mental impairment at Step 2. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c), 416.921, 416.923; *Pate-Fires*, 564 F.3d at 942 (explaining severe impairments). Nor in such circumstances could the ALJ have formulated an RFC that included no provision for any mental limitations that reduce plaintiff's ability to perform some types of unskilled work. *See Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 632 (8th Cir. 2014) (explaining the RFC determination in the context of mental impairments); *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011). Consequently, the ALJ could not have relied on the vocational expert's hypothetical, which did not include any mental limitations, as substantial evidence at Step 5. *See Gieseke v. Colvin*, 770 F.3d 1186, 1189 (8th Cir. 2014); *Buckner*, 646 F.3d at 561 (explaining that, for a vocational expert's opinion to constitute substantial evidence at Step 5, an ALJ's hypothetical must have "captured all of the concrete *consequences* of" a claimant's "credible impairments" (quotation marks, bracketing, and citation omitted)); *see also* 20 C.F.R. § 404.1568(a) (defining unskilled work). As a result, the Court must reverse and remand for the ALJ to consider Dr. Palepu's opinion in the first instance. *See Whitney v. Astrue*, 668 F.3d 1004, 1005–06 (8th Cir. 2012); *Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir. 2005) (remanding because an ALJ failed to make adequate findings with regard to a psychologist's opinion).

## VI.    Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and the matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 9th day of September, 2016.